**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **FRED H. KELLER, JR., JUAN DOE, and JUANA DOE #2,** | ) | **CASE NO. 8:10CV270** |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **MEMORANDUM** |
| | ) | **AND ORDER ON MOTIONS FOR** |
| **CITY OF FREMONT, DALE** | ) | **SUMMARY JUDGMENT** |
| **SHOTKOSKI, in his Official Capacity,** | ) | |
| **and TIMOTHY MULLEN, in his Official** | ) | |
| **Capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **MARIO MARTINEZ, JR., PAULA** | ) | **CASE NO. 4:10CV3140** |
| **MERCADO, MARTIN MERCADO,** | ) | |
| **JANE DOE, MARIA ROE, STEVEN** | ) | |
| **DAHL, ACLU NEBRASKA** | ) | |
| **FOUNDATION, UNITED FOOD AND** | ) | |
| **COMMERCIAL WORKERS UNION,** | ) | |
| **LOCAL 22, AND BLAKE HARPER,** | ) | **MEMORANDUM** |
| | ) | **AND ORDER ON MOTIONS FOR** |
| **Plaintiffs,** | ) | **SUMMARY JUDGMENT** |
| **v.** | ) | |
| | ) | |
| **CITY OF FREMONT; DALE** | ) | |
| **SHOTKOSKI, IN HIS OFFICIAL** | ) | |
| **CAPACITY AS FREMONT CITY** | ) | |
| **ATTORNEY; AND TIMOTHY** | ) | |
| **MULLEN, IN HIS OFFICIAL** | ) | |
| **CAPACITY AS FREMONT CHIEF OF** | ) | |
| **POLICE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

Before the Court are the Plaintiffs' Motions for Summary Judgment (Filing No. 151 in Case No. 4:10cv3140, and Filing No. 161 in Case No. 8:10cv270) and Defendants' Motions for Summary Judgment (Filing No. 157 in Case No. 4:10cv3140, and Filing No. 130 in Case No. 8:10cv270). The Plaintiffs ask the Court to declare invalid Ordinance

No. 5165 (the "Ordinance") amending the municipal code of the City of Fremont, Nebraska (the "City"), and to enjoin the City from enforcing the Ordinance. Defendants ask the Court to find that the Plaintiffs lack standing to raise equal protection claims, or claims under the Fair Housing Act, 42 U.S.C. § 1981, or the Commerce Clause; that the Ordinance is valid in all respects; and that the Plaintiffs' actions should be dismissed. For the reasons discussed below, all the Motions will be granted in part and denied in part, and the City will be enjoined from enforcing certain parts of the Ordinance that prohibit the harboring of illegal aliens and provide for the revocation of occupancy licenses.

## I. THE ORDINANCE

The Ordinance was adopted by City voters on June 21, 2010, and was scheduled to take effect on July 29, 2010. Its stated purpose was "to prohibit the harboring of illegal aliens or hiring of unauthorized aliens." The substantive provisions of the Ordinance are set out in "Section 1," in five parts:

Part 1 defines the terms used in the remaining parts.

Part 2 provides, in essence, that: "It is unlawful for any person or business entity that owns a dwelling unit in the city to harbor an illegal alien in the dwelling unit, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, unless such harboring is otherwise expressly permitted by federal law." Harboring includes both the owner's direct renting or leasing, as well as the owner's knowing or reckless permitting of such occupancy. An alien unlawfully present in the United States who enters into a lease after the effective date of the Ordinance is deemed to have breached a condition of the lease.

2

Part 3 provides that each person who is at least 18 years of age must obtain an occupancy license through the Fremont Police Department before occupying any leased or rented dwelling unit.  Occupancy licenses cost $5.00, and applicants for the licenses must provide the following information: name; mailing address; address of dwelling unit; name and business address of the unit's owner or manager; date of lease commencement; date of birth of occupant; occupant's country or citizenship; name and date of birth of each minor dependent residing with occupant; and either a signed declaration that the applicant is a United States citizen or national or an identification number assigned by the federal government establishing lawful presence.  If the applicant is not a United States citizen or national and knows of no identification number establishing lawful presence, then the applicant may make a declaration to that effect and obtain the occupancy license.  Lessors may not rent or lease dwelling units without obtaining copies of occupancy licenses for each known occupant of the dwelling unit, and must not knowingly permit persons to occupy a dwelling unit without a license.  Lease documents for dwelling units must provide that occupancy by persons 18 years of age and older who do not hold valid licenses is a default under the lease.  Violation of any provision of Part 3 by any person can give rise to a fine of $100 per occupant per day, starting on the 46th day after a revocation notice has been issued under "Section 5," which appears to intend a cross-reference to Part 4.D. of Section 1 of the Ordinance.

Part 4 requires the Fremont Police Department ("FPD") to ask the federal government to verify the status of occupants who have not declared themselves to be United States citizens or nationals.  If the federal government reports that the occupant is not lawfully present in the United States, FPD will send a deficiency notice to the occupant,

3

notifying the occupant that, within 60 days, the occupant may seek a correction of the federal government's record or provide additional information through FPD or directly to the federal government.  No earlier than the 61st day after the deficiency notice is issued, FPD will again contact the federal government to ascertain the occupant's immigration status, and, if the federal government reports that the occupant is an alien not lawfully in the United States, FPD will send a revocation notice to the occupant and the lessor, revoking the occupancy license effective 45 days after the date of the revocation notice.  Occupants and landlords may seek judicial review of the notice of revocation, before or after its effective date, by filing suit against the City.  The filing of any such action automatically stays the revocation until the final conclusion of judicial review.

Part 5 provides that employers seeking any license or permit from the City, any contract awarded by the City, or any grant or loan given by the City, must execute an affidavit to the effect that the business entity does not knowingly employ any person who is an unauthorized alien, and must provide documentation confirming that it has registered in the E-Verify Program.  All agencies of the City also must register with E-Verify, and use the program to verify each employee's authorization for employment.  Every business entity employing one or more employees and performing work within the City must register with E-Verify within 60 days after the effective date of the Ordinance and use E-Verify to confirm the lawful employment status of each employee hired after such registration.  Other employers that begin performing work within the City later than 60 days after the effective date of the Ordinance must register with and use E-Verify to confirm the lawful status of employees hired after the registration, before the employees may begin work within the City.  If the Fremont City Council, following notice and hearing, finds that an employer has

4

violated this mandate, the Council may revoke the license, cancel the contract, recall the grant, or accelerate the loan and institute an action to collect sums due.  Actions of the City Council are subject to appeal to the District Court of Dodge County, Nebraska.  The City Attorney may bring civil actions against employers suspected of violating the Ordinance, seeking injunctive relief.  Adverse actions by the City will be stayed pending judicial review initiated by an employer.

Section 2 of the Ordinance provides that its parts and provisions are severable in the event that any part or provision of the Ordinance is found to be invalid or unenforceable due to conflict with state or federal law.

## II. THE PARTIES

To establish standing, a plaintiff must have suffered an injury in fact that is (1)(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) traceable to the defendant's challenged action; and (3) likely to be redressed by a favorable decision.  *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 591 (8th Cir. 2003)(hereafter "*Hazeltine II*"), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 561 (1992).  If a plaintiff does not show an injury that is concrete, particularized, and actual or imminent, the plaintiff lacks standing to assert a claim, and a court is without subject matter jurisdiction over such an action.  *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002).  The Plaintiffs have met their burden of demonstrating standing with respect to the claims made by each.

The *Keller* Plaintiffs are Fred H. Keller, a landlord with residential rental property in the City; Juan Doe, a City resident who is "presently pending immigration proceedings"; and

5

Juana Doe #2, an undocumented City resident, renting an apartment unit month-to-month, without a lease.

The *Martinez* Plaintiffs are Mario Martinez, Jr., a United States citizen who resides in the City and rents his house on a monthly basis; Paula and Martin Mercado, United States citizens, who reside in the City and rent their house on a monthly basis; Jane Doe, a United States citizen and City resident who lives in leased rental property with her undocumented fiancé; Maria Roe, a United States citizen who lives in the City with her undocumented husband and rents an apartment on a monthly basis; Steven Dahl, a City residential landlord with 61 rental units and "about 130 to 140 tenants"; the ACLU Foundation, an employer whose employees have performed work in the City, and will do so in the future, and that does not use the E-Verify program; the United Food and Commercial Workers Union, Local 22 ("UFCW"), an employer with employees working in the City and representing 5,500 workers in Nebraska, that does not use the E-Verify program; and Blake Harper, the owner of a business that rents out residential properties in the City.

Named as Defendants in both actions are the City; Dale Shotkoski, the City Attorney, in his official capacity; and Timothy Mullen, the City's Chief of Police, also in his official capacity.

### III.  PROCEDURAL HISTORY

On July 21, 2010, the above-captioned cases were filed, promptly followed by Motions for Preliminary Injunctions and supporting Briefs and Indexes of Evidence.  On July 27, 2010, the Fremont City Council resolved that the Ordinance would not be enforced until 14 days after the issuance of final decisions in each of the cases.  On July 28, 2010,

counsel for the parties appeared before the Court to argue the Plaintiffs' respective motions for preliminary injunctive relief.[1]  The Court questioned whether it should abstain from exercising jurisdiction, because the Plaintiffs in both actions presented claims that the Ordinance is void as a matter of state law.  The parties briefed the question of subject matter jurisdiction, and all parties expressed their desire for the Court to exercise jurisdiction.[2]

After certifying the state law question to the Nebraska Supreme Court, which was declined, with explanation[3], this Court conducted a brief analysis of whether abstention was appropriate under the principles articulated by the Supreme Court in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941).  Because it did not appear that a state court's construction of any unsettled question of state law might avoid the need for this Court to reach the federal questions presented, this Court concluded that *Pullman* abstention was not necessary or appropriate and that the federal questions should be addressed.  (Filing No. 44 in Case No. 8:10cv270 and Filing No. 42 in Case No. 4:10cv3140).  A briefing schedule was established, but the Plaintiffs withdrew their motions for preliminary injunctive relief, and proceeded with discovery, followed by the Motions now before the Court.

---

[1]  Counsel for the parties agreed that the cases should be consolidated for purposes of the motions for preliminary injunctive relief, as well as discovery, and the Court effected the consolidation on September 2, 2010, with Case No. 8:10cv270 as Lead Case.

[2]  Although no party has disputed the Court's subject matter jurisdiction, the Court has undertaken an independent analysis and is satisfied that it has Article III subject matter jurisdiction in this case, and that each Plaintiff has standing to assert the claims presented by that Plaintiff.

[3]  *Keller v. City of Fremont*, No. S-33-100018, November 5, 2010.

## IV.  STANDARD OF REVIEW

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Gage v. HSM Elec. Prot. Serv., Inc.,* 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)).  The court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inferences in [that party's] favor."  *Schmidt v. Des Moines Pub. Sch.,* 655 F.3d 811, 819 (8th Cir 2011).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact."  *Id.* at 325.  Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial."  *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).  The nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.) (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 586-87)), *cert. denied,* 132 S. Ct. 513

8

(2011). "'[T]he mere existence of *some* alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cnty.,* 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "'genuine issue for trial'"–summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).

With respect to construction of duly enacted statutes and ordinances, it is recognized that "if a law is susceptible of a reasonable interpretation which supports its constitutionality, the court must accord the law that meaning." *Jones v. Gale*, 470 F.3d 1261, 1268 (8th Cir. 2006) (quoting *Planned Parenthood of Minn. v. State of Minn.*, 910 F.2d 479, 482 (8th Cir. 1990)); *see also Frisby v. Schultz*, 487 U.S. 474, 483 (1988) ("To the extent they endorsed a broad reading of the ordinance, the lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties"); and *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

9

## V.  DISCUSSION

All Plaintiffs have challenged the Ordinance on five grounds, asserting: (1) it violates the Supremacy Clause, Article VI, Clause 2 of the United States Constitution, because it attempts to regulate matters that are exclusively reserved to the federal government ("direct preemption"), it operates in a field over which Congress has exercised exclusive authority ("field preemption"), and it conflicts and interferes with federal laws and regulations ("conflict preemption"); (2) it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; (3) it violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by depriving Plaintiffs of liberty and property interests without due process of law, and because it is unconstitutionally vague; (4) it violates the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*; and (5) it exceeds the municipal authority of Fremont, Nebraska, under Article XI of the Nebraska Constitution. The *Keller* Plaintiffs have also challenged the Ordinance on grounds that (6) it denies the right of Latino Plaintiffs to make and enforce contracts on the same basis as white persons in violation of 42 U.S.C. § 1981; and (7) it violates the Commerce Clause and the Due Process Clause of the Fourteenth Amendment to the United States Constitution because it denies employers meaningful pre-deprivation due process and is unconstitutionally vague.[4]

---

[4] In the Keller Plaintiffs' brief, they address only two of the seven causes of action from their First Amended Complaint.  Although it appears that they may have abandoned some of their claims, this Court will address all claims the Keller and Martinez Plaintiffs raise in their Amended Complaints (Filing No. 70 in Case No. 8:10cv270, and Filing No. 73 in Case No. 4:10cv3140).

10

### *A. Supremacy Clause and Federal Preemption*

The Plaintiffs' Briefs in support of their Motions for Summary Judgment focus on the

merits of their claims under the Supremacy Clause and concepts of federal preemption.

These concepts were described by the Supreme Court succinctly in *Hillsborough County,*

*Fla. v. Automated Medical Laboratories, Inc.,* 471 U.S. 707 (1985):

> It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to," federal law. Under the Supremacy Clause, federal law may supersede state law in several different ways. First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. In the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. Pre-emption of a whole field also will be inferred where the field is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."
>
> Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]"
>
> We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes. Also, for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws.

*Id.* at 712-13 (internal citations omitted).

Courts begin with a presumption *against* preemption. When Congress legislates "in

a field which the States have traditionally occupied . . . . we start with the assumption that

the historic police powers of the States were not to be superseded by the Federal Act

unless that was the clear and manifest purpose of Congress." *United States v. Locke*, 529

U.S. 89, 108 (2000)(internal quotation marks omitted) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)).  Nor should pre-emption be assumed "when the State regulates in an area where there has been a history of significant federal presence."  *Id.*

With respect to the "field" of immigration, the Supreme Court has held that the Constitution of its own force requires pre-emption of any state efforts to regulate immigration, but not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976) (upholding California law prohibiting employers from knowingly employing aliens not entitled to lawful residence in the United States).  A state law regulates immigration and is pre-empted under the Constitution only if the state law is "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."  *Id.*

With respect to conflict pre-emption, there must be an actual conflict between the state law or ordinance and the federal Constitution or statute in order for pre-emption to apply.  A hypothetical or potential conflict will not support a finding of pre-emption.  *English v. General Elec. Co.*, 496 U.S. 72, 89 (1990).

### 1.  Employment Provisions, Including Mandatory Use of E-Verify

The *Martinez* Plaintiffs argue that the Ordinance's E-Verify mandate is preempted under concepts of both field preemption and conflict preemption.  At the time the initial Complaints in both cases were filed, there was a split in legal authority on this issue.[5]

---

[5]  In *Lozano v. City of Hazelton*, 620 F.3d 170, 206-19 (3rd Cir. 2010) ("*Lozano II*"), *vacated and remanded*, 131 S. Ct. 2958 (2011), the U.S. Court of Appeals for the Third Circuit found that a Pennsylvania town's ordinance regulating employment was conflict preempted by the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. §§ 1324a

That split in authority has since been resolved by the United States Supreme Court in *Chamber of Commerce v. Whiting*, 131 S.Ct. 1968 (2011).  In *Whiting*, the Supreme Court examined an Arizona law that mandated the use of E-Verify and allowed Arizona courts to suspend or revoke business licenses of employers who knowingly or intentionally hired unauthorized aliens[6].  The Court held that the Arizona law was not expressly preempted by the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. §§ 1324a-1324b, because the statute fell "squarely" within the confines of IRCA's savings clause.  *Id.* at 1973.  Paraphrasing the savings clause, the Court stated that "IRCA expressly preempts States from imposing 'civil or criminal sanctions' on those who employ

---

- 1324b, because the ordinance stood as an obstacle to the accomplishment of the likely objectives Congress had when enacting IRCA.  The Third Circuit Court also found the ordinance to be conflict-preempted by IRCA and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 11 Stat. 3009 (1996) (codified in various sections of 8 U.S.C and 18 U.S.C. and establishing the program later known as E-Verify), because the ordinance offered a safe harbor only for employers that used E-Verify, and not for those who relied on the I-9 process to verify employees' work authorization.  *Id.* at 214.

A contrary conclusion was reached by the Court of Appeals for the Ninth Circuit in *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856 (9th Cir. 2009), when it considered the constitutionality of an Arizona state law.  The Ninth Circuit concluded that the Arizona law, requiring employers to use E-Verify and allowing Arizona courts to suspend or revoke business licenses of employers who knowingly or intentionally hired unauthorized aliens, was not expressly nor impliedly preempted by IRCA or IIRIRA.  The Ninth Circuit Court relied upon IRCA's express preemption provision, which states: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."  (*Id.* at 861) (quoting 8 U.S.C. § 1324a(h)(2)).

[6] "The term 'alien' means any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).  "Immigrants" are a sub-class of "aliens," with a very complex definition spanning sixteen pages of the United States Code.  8 U.S.C. § 1101(a)(15). Accordingly, the term "alien" is not a pejorative, but is the all-encompassing term for persons not citizens or nationals of the United States.  As the broader term, it is used throughout this Memorandum and Order.

unauthorized aliens, 'other than through licensing and similar laws.'" *Id.* at 1977 (quoting 8 U.S.C. § 1324a(h)(2)). The Court concluded that because Arizona's law "fell within the confines of the authority Congress chose to leave to the states" it was not expressly preempted. *Id.* at 1981. The Supreme Court also held that the Arizona law was not impliedly preempted because it did not conflict with the mechanics or purposes of IRCA. The Court noted that the Arizona statute "simply implemented the sanctions that Congress expressly allowed Arizona to pursue through licensing laws." *Id.* It said that where Congress has "specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority." *Id.* The Court observed that when Congress enacted IRCA, it sought to strike a balance among a variety of interests, which included "allocating authority between the Federal Government and the States, thus, preserving state authority 'over a particular category of sanctions–those imposed 'through licensing and similar laws.'" *Id.* at 1984. The Supreme Court concluded that "[t]he balancing process that culminated in IRCA resulted in a ban on hiring unauthorized aliens" and the Arizona law "simply seeks to enforce that ban." *Id.* at 1985.

The Supreme Court also held that the Illegal Immigration Reform and Immigrant Responsibility Act of 1986 ("IIRIRA"), Pub. L. No. 104-208, 11 Stat. 3009 (1996) (codified in various sections of 8 U.S.C. and 18 U.S.C.), which established the program later known as E-Verify, "contains no language circumscribing state action." *Id.* The Court found Arizona's use of E-Verify did "not conflict with that federal scheme", but was "entirely consistent with federal law." *Id.* The Court noted "Congress's objective in authorizing the development of E-Verify was to ensure reliability in employment authorization verification,

14

combat counterfeiting of identity documents, and protect employee privacy." *Id.* at 1986. The Supreme Court concluded that Arizona's requirement that employers use E-Verify did not obstruct achievement of those stated goals. *Id.*

Like the Arizona law at issue in *Whiting,* the employment provisions in the Fremont Ordinance are essentially "licensing" or "similar" laws, falling within IRCA's savings clause. The Ordinance provides conditions for the granting of business licenses, permits, contracts, grants and loans, and a process for the revocation of licenses, cancellation of contracts, recall of grants, and acceleration of loans, if those conditions are violated. While it purports to impose conditions on any employer "performing work within the City," the Ordinance does not provide for any fines or other penalties for non-compliance, but anticipates discretionary action by the City Attorney, seeking "injunctive relief." The Fremont Ordinance does not provide for immediate suspension of licenses, or any other adverse consequences for an employer, prior to full procedural due process, including judicial review.

Because the Fremont Ordinance is not "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain," it is not preempted by the United States Constitution. *DeCanas v. Bica*, 424 U.S. at 355. Because the Ordinance is essentially a licensing or similar law, falling within the savings clause of IRCA, it is not directly preempted, nor field preempted, by IRCA and/or IIRIRA. *Whiting*, 131 S.Ct. at 1987. Because it is possible for employers to comply

15

with both federal law and the Ordinance's provisions, this Court cannot conclude that a conflict "will necessarily arise."  See *Goldstein v. California*, 412 U.S. 546, 554 (1973).[7]

### 2.  Housing Provisions

Because the housing provisions in the Ordinance are not "essentially a determination of who should or should not be admitted into the country, and the conditions under which a *legal entrant* may remain," they are not preempted by the federal Constitution itself.  *DeCanas v. Bica,* 424 U.S. at 355 (emphasis added).  Nor has Congress expressly preempted state and local legislation of the nature found in the Ordinance's housing provisions.

As the Plaintiffs note, however, Congress has developed a "complex scheme" for adjudicating an individual's right to remain in this country (*see* Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*), and those who have entered illegally, or who have remained unlawfully, often are allowed to remain pending full adjudication of their status – which adjudication may take many years and may ultimately lead to lawful status or even full citizenship.  See, *e.g.*, 8 U.S.C. § 1229b(b) (providing for cancellation of removal and adjustment of status for certain aliens), and 8 U.S.C. § 1255 *et seq.* (providing for adjustment of status of certain aliens).  Fifty-seven U.S. immigration courts process over 300,000 cases each year, the great majority of which are removal matters.  (Department of Justice Executive Office for Immigration Review, 2010 Statistical Year Book.)

---

[7]  Were the City Attorney to exercise his discretion to bring an action against any of the *Martinez* Plaintiffs, seeking injunctive relief against them, they could raise their conflict-preemption challenge to the Ordinance, and the court could rule on the "as applied" challenge with the benefit of a complete factual record.

Congress's complex immigration scheme also includes penalties for the harboring of aliens who have entered or remained in the United States in violation of law.  (8 U.S.C. § 1324.)

While it may be inferred that Congress has preempted the field of immigration– *i.e.* what, where, when, and how aliens or immigrants may enter and must leave the country–it cannot be inferred that states and municipalities have no authority to enact laws and ordinances that are in harmony with federal objectives.  As the Supreme Court said in *Plyler v. Doe*, 457 U.S. 202 (1982):  "States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal."  *Id.* at 225.  "Despite the exclusive federal control of this Nation's borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns."  *Id.* at 228 n.23.

The question, then, is whether the Ordinance's housing provisions are in harmony with federal immigration laws, or in conflict with them.

The INA reflects Congress's intent that state and local authorities "communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States" and "otherwise . . . cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."  8 U.S.C. § 1357(g)(10).  To the extent that the Ordinance requires persons seeking residential occupancy permits to provide certain information concerning their immigration status, or lack thereof, and requires FPD to communicate such information to federal authorities, the Ordinance is in harmony with INA's objective of facilitating cooperation between officers and employees

17

of states and political subdivisions and federal immigration authorities regarding the identification of individuals who may be in the United States unlawfully.

To the extent that the Ordinance, in Section 1, Parts 2, 3.L., and 4.D., provides penalties for the harboring of persons who have entered or remained in the United States in violation of law, or provides for the revocation of occupancy licenses and penalties for the lease or rental or dwelling units following the revocation of occupancy licenses, it conflicts with the INA, presenting "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough,* 471 U.S. at 713 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).   Once an individual is identified to federal authorities as an alien present in this country, the INA and federal regulations, including those promulgated by the Department of Homeland Security, 8 C.F.R. § 1.1 *et seq.*, provide the structure for the individual's classification and/or removal.  If states or political subdivisions take independent action to remove aliens from their jurisdiction, essentially forcing them from one state or community to another where their identity and whereabouts may be obscured, the structure Congress has established for the classification, adjudication, and potential removal of aliens will be impaired.  *See Lozano v. City of Hazelton*, 620 F.3d 170, 219-224 (3rd Cir. 2010) ("*Lozano II*") (ordinance making tenant's legal immigration status a condition precedent to residential lease agreements and prohibiting the rental of residential units to illegal aliens was conflict-preempted by INA in general, and by 8 U.S.C. § 1324 specifically), *vacated and remanded*, 131 S. Ct. 2958 (2011)[8]; *Garrett v. City of Escondido*, 465 F. Supp.2d 1043, 1056-57 (S.D. CA 2006)

---

[8] Although the judgment in *Lozano II* was vacated and remanded for further consideration in light of the decision in *Whiting*, this Court still finds the discussion in

(ordinance prohibiting landlords from renting to illegal aliens likely was field- or conflict-preempted by existing federal statutes, including harboring statute, 8 U.S.C. § 1324); *Villas at Parkside Partners v. City of Farmers Branch, Texas,* 701 F. Supp. 2d 835, 860 (N.D. Tex. 2010) (ordinance revoking occupancy licenses for illegal aliens was preempted by INA, "because it interferes with Congress's chosen method for removal of illegal aliens and interferes with the uniform application of the nation's immigration laws").

Accordingly, Section 1, Parts 2, 3.L., and 4.D., of the Ordinance, prohibiting the harboring of illegal aliens, and providing for the revocation of occupancy licenses and for certain penalties following such revocation, are preempted by federal law.

"Generally, the partial invalidity of an ordinance does not necessarily make the remaining provisions of the ordinance ineffective. If a city ordinance contains valid and invalid provisions, the valid portion will be upheld if it is a complete law, capable of enforcement, and is not dependent upon that which is invalid. In other words, the valid part may be carried into effect if what remains after the invalid part is eliminated contains the essential elements of a complete ordinance." *Sarpy v. City of Papillion,* 765 N.W.2d 456, 466 (Neb.,2009) (footnotes references omitted). Because the essential elements of a complete ordinance remain when Section 1, Parts 2, 3.L., and 4.D., are stricken, the Court finds those provisions to be severable.

---

*Lozano II* persuasive as it relates to housing. In *Lozano II* the Third Circuit distinguished state regulation of employment and state regulation of housing, and *Whiting* focused on the interaction between federal immigration and state laws dealing with the employment of unauthorized aliens. *Whiting* is silent on housing and is not contrary to *Lozano II* on this issue. *See Central Ala. Fair Housing Ctr. v. Magee*, — F.Supp.2d —, 2011 WL 6182334 at *5 n.7.

### *B.  Equal Protection*

 "The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler,* 457 U.S. at 216, (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).  "But so, too '[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same'" *Id.* (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)).

> The initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the States.  A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill.  In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

*Id.*

In *Plyler,* the Supreme Court held that, under the Equal Protection Clause, states may not deny children access to public education based on their undocumented immigration status.  The Supreme Court concluded that children of illegal aliens were similarly situated with other children for purposes of public education, noting specifically that the alien children lacked any responsibility for, or control over, their unlawful status. *Id.* at 219-20.  The Court then rejected the arguments presented by the state of Texas in support of the legislation, concluding that the denial of public education to children of illegal aliens was not fiscally advantageous nor an effective deterrent to illegal immigration.  *Id.* at 228-30. The Court distinguished its earlier decision in *DeCanas v. Bica*, 424 U.S. 351 (1976), in which it held that states *may* prohibit the *employment* of illegal aliens.

The *Plyler* Court observed that illegal aliens are not a suspect class, and a state need not demonstrate that the  treatment of illegal aliens in a manner different from other persons is precisely tailored to serve a compelling governmental interest.  *Plyler*, 457 U.S. at 219 n.19, and 223.  ("Of course, undocumented status is not irrelevant to any proper legislative goal."  *Id.* at 220.  "[T]hose who elect to enter our territory by stealth and in violation of our law should be prepared to bear the consequences, including, but not limited to, deportation."  *Id.*)

Parts 2, 3, and 4 of Section 1 of the Fremont Ordinance do discriminate against adults, age 18 and older, who are in the United States unlawfully, by providing a mechanism through which they may forfeit residential occupancy licenses.[9]  Applying the logic of *Plyler*, however, adults who are in the United States unlawfully and persons who are here lawfully *are not similarly situated* for the purpose of occupying leased or rented dwelling units.  As the Supreme Court said, "undocumented status . . . is the product of conscious, indeed unlawful, action."  *Id.* at 220.

"Absent a threshold showing that [a plaintiff] is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim."  *Klinger v. Department of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994).  The Plaintiffs here have not made a threshold showing that, for purposes of leasing or renting housing, they are similarly situated to persons who are present in the United States lawfully, and this Court finds, as a matter of law, that they are not.

---

[9]  The Ordinance's indirect impact on children is apparent and acknowledged.

21

Even *if* persons who are in the United States unlawfully and those who are here lawfully *were* to be considered similarly situated for purposes of occupying leased or rented dwelling units, the City has articulated a rational basis for the different treatment afforded to the two classes.  The preamble to the Ordinance states seven reasons for its enactment, including the reduction of crime, the conservation of the public fisc, the preservation of jobs and wage-rates for lawful residents, and other objectives mirroring those expressed in federal statutes.[10]

Finally, although the Plaintiffs suggest that they have been subjected to intentional discrimination on the basis of their race or national origin, they have not come forward with sufficient evidence to raise a genuine issue of material fact for trial.  The Plaintiffs' evidence consists generally of demographic data and statements made by a few supporters of the Ordinance that Plaintiffs suggest imply racial or ethnic animus.  The Ordinance on its face is neutral with respect to race and national origin, and specifically mandates that it "shall be applied uniformly, and enforcement procedures shall not differ based on a person's race, ethnicity, religion, or national origin."  Ordinance at § 4 (E).  It is the Plaintiffs' burden to prove that an unlawful discriminatory purpose was a motivating factor in the voters' decision to adopt the Ordinance.  See *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270 (1977).  The Plaintiffs have directed the Court to

---

[10]   Although the Plaintiffs assert that these are not legitimate local objectives, historically, municipalities have exercised certain police powers and regulatory authority to ensure the peaceful and orderly operation of business and domestic life within their boundaries.  Such powers include the authority to zone property, adopt property-use regulations, and limit the occupancy and use of single and multi-family dwellings.  Cities have a legitimate interest in knowing who is residing within their boundaries, where residents are living, and who bears responsibility for activity on and about any given premises.

no case in which such scant evidence and conjecture has been found sufficient to support a conclusion that unlawful discrimination was a motivating factor in the enactment of a statute, ordinance, or initiative.

### C. Due Process

All Plaintiffs allege that the Ordinance is void for vagueness and deprives them of their liberty and property without due process of law.  Only the *Martinez* Plaintiffs have briefed this issue, and only with respect to the alleged vagueness of the Ordinance's housing provisions.

First, the *Martinez P*laintiffs argue that the Ordinance does not adequately define certain key terms.  Specifically, they claim that a clear and unambiguous definition of the term "occupant" is critical, because members of the public must know who is subject to the Ordinance's housing-related requirements.  The *Martinez* Plaintiffs also assert that the term "temporary guest" is impermissibly vague, giving landlords, tenants and guests insufficient notice of whether they are in violation of the Ordinance.

Second, they argue that the Ordinance fails to give landlords and tenants adequate notice of *when* occupancy licenses must be procured, *e.g.*, whether permits are necessary at times of lease renewals and extensions, holdovers, month-to-month rentals, and new family member occupancies.

Third, they contend that the Ordinance fails to establish minimal guidelines for enforcement, giving rise to an unconstitutional risk of arbitrary enforcement, as with the state statute found to be unconstitutional in *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) (statute requiring persons who loiter on streets to provide "credible and reliable" identification at request of police officers is unconstitutionally vague, permitting "a

23

standardless sweep [that] allows policemen, prosecutors and juries to pursue their personal predilections.").

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits . . . ." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-403 (1966). "Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce." *Id.* at 403. "Provisions . . . which fail to give a 'person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute' have been found void for vagueness, especially 'where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights.'" *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 749 (8th Cir. 2008) (quoting *Colautti v. Franklin*, 439 U.S. 379, 390-91 (1979)). A statute is void for vagueness if it does not provide "fair warning of the conduct that is prohibited" so that a "person of ordinary intelligence" can comply with the statute, or if leaves "those who are enforcing it with unfettered discretion to determine whether a violation has occurred." *Veneklase v. City of Fargo,* 248 F.3d 738, 747 (8th Cir. 2001). However, "enforcement of all laws involves some discretion." *Thorburn v. Austin*, 231 F.3d 1114, 1121 (8th Cir. 2000). ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict [protected] activity." *Id.* (citing *Grayned v. City of Rockford,* 408 U.S. 104, 110-14 (1972)).

"Facial challenges to legislative enactments [under the void-for-vagueness doctrine] are, to say the least, discouraged." *Gallagher v. Magner*, 619 F.3d 823, 841 (8th Cir. 2010) (citing *United States v. Stephens*, 594 F.3d 1033, 1037 (8th Cir. 2010)). Plaintiffs "must do

more than allege general confusion regarding a legislative enactment." *Id.* "Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks. Facial adjudication carries too much promise of 'premature interpretatio[n] of statutes' on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 608-09 (2004) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)) (laws should not be invalidated by "reference to hypothetical cases").

The Plaintiffs' due process challenge to the Ordinance is a facial challenge, essentially alleging general confusion regarding the meaning of the Ordinance, but they have not demonstrated any genuine issue of material fact remains for trial with respect to this issue, and their due process claim will be denied.

### D.  Fair Housing Act

The Third Amended Complaint in the *Martinez* case alleges that the Ordinance "violates the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, because it discriminates on the basis of race and/or national origin."  (Filing No. 73 in Case No. 4:10cv3140, p. 28.)  The First Amended Complaint in the *Keller* case alleges that the City has "imposed terms and conditions on the rental of housing in the city that has a disproportionate negative impact on Latinos in violation of the federal Fair Housing Act."  (Filing No. 70 in Case No. 8:10cv270, p. 17.)  While these claims are rendered moot to some degree by the Court's conclusions in part V.A.2., above, they will be addressed.

The Fair Housing Act (Title VIII of the Civil Rights Act of 1968, "Title VIII") at 42 U.S.C. § 3604 provides, in part, that:

 [I]t shall be unlawful –

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race . . . or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental or a dwelling, or in the provision of services or facilities in connection therewith, because of race . . . or national origin.

(c) To make, print, or publish, or cause to be made, printed or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race . . . or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race . . . or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

In *Espinoza v. Farah Manufacturing Co., Inc.*, 414 U.S. 86 (1973), the Supreme Court interpreted similar prohibitions related to employment, found in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. The Court said: "The term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Id.* at 88. "And there is no reason to believe Congress intended the term 'national origin' . . . to have any broader scope." *Id.* at 90.

The Supreme Court recognized that:

[T]here may be many situations where discrimination on the basis of citizenship would have the effect of discriminating on the basis of national origin. In some instances, for example, a citizenship requirement might be but one part of a wider scheme of unlawful national-origin discrimination. In other cases, an employer might use a citizenship test as a pretext to disguise what is in fact national-origin discrimination. Certainly Tit. VII prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin."

*Id.* at 92.

The Court concluded, however, that a prohibition on discrimination based on national origin did *not* encompass discrimination based on a plaintiff's alienage:

> Certainly it would be unlawful for an employer to discriminate against aliens because of race, color, religion, sex, or national origin – for example, by hiring aliens of Anglo-Saxon background by refusing to hire those of Mexican or Spanish ancestry. Aliens are protected from illegal discrimination under the Act, but nothing in the Act makes it illegal to discriminate on the *basis of* citizenship or alienage.

*Id.* at 95 (emphasis added).

The Plaintiffs in the *Martinez* case ask this Court to infer that the Defendants have engaged in a scheme of unlawful discrimination by using the undocumented status of certain residents as a pretext to disguise what is in fact discrimination based on race or national origin. As discussed above, while it is apparent that the Ordinance is likely to affect persons of Latino or Hispanic ethnicity more than persons of other races and national origins, the Plaintiffs have not met their burden of proving that Fremont voters *intended* to develop a scheme of unlawful discrimination, nor have they presented sufficient evidence to demonstrate a genuine issue of material fact as to whether discriminatory animus was a motivating factor in the vote. "Proof of discriminatory purpose is crucial for a disparate treatment claim." *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010) (citing *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977)).

The Plaintiffs in the *Keller* case ask the Court to recognize that the Ordinance has a disparate negative *impact* on Latino residents. The Eighth Circuit Court of Appeals has "recognized a disparate impact cause of action under the Fair Housing Act against governmental authorities." *Saunders v. Farmers Ins. Exchange,* 537 F.3d 961, 964 (8th Cir. 2008) (citing *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 902-03 (8th Cir.2005)). "To prove discrimination under a disparate impact analysis [a plaintiff] must show a facially neutral policy has a significant adverse impact on members

27

of a protected minority group." *Oti Kaga, Inc. v. South Dakota Housing Development Authority*, 342 F.3d 871, 883 (8th Cir. 2003) (citing *Chambers v. Omaha Girls Club, Inc.*, 834 F.2d 697, 700 (8th Cir.1987)). "The burden then shifts to [the defendant] to show the policy has a manifest relationship to [legitimate governmental objectives]. If [the defendant] is able to show the policy is justified, [the plaintiff] may nonetheless prevail by showing another policy would accomplish [the defendant's] objectives *without the discriminatory effects*." *Id.* (emphasis added).

This Court infers from the Supreme Court's analysis of Title VII in *Espinoza* that the Fair Housing Act does not prohibit discrimination on the *basis of alienage*, and that aliens are not a *protected* minority group. Because the Ordinance will have a disparate impact on Hispanic/Latino residents by virtue of the fact that undocumented aliens in the Fremont community are more likely to have origins in Latin American countries than in other countries, however, the Plaintiffs satisfy the first prong of the three-prong analysis for disparate impact claims under the FHA. *Gallagher*, 619 F.3d at 833-35 (enforcement of facially neutral housing codes had disparate impact on racial minorities, who occupied low income housing in disproportionate numbers). The burden then shifts to the Defendants to demonstrate that the policy or practice has a manifest relationship to a legitimate, nondiscriminatory policy objective. *Id.* at 834 (citing *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.,* 417 F.3d 898, 902 (8th Cir. 2005)).

As noted above, "if a law is susceptible of a reasonable interpretation which supports its constitutionality, the court must accord the law that meaning." *Jones v. Gale*, 470 F.3d 1261, 1268 (8th Cir. 2006) (quoting *Planned Parenthood of Minn. v. State of Minn.*, 910 F.2d 479, 482 (8th Cir. 1990)). The Ordinance on its face appears to have a manifest

28

relationship to legitimate, nondiscriminatory policy objectives, and the Court will accord it such an interpretation. As the Supreme Court said in 1982, there is "a substantial 'shadow population' of illegal migrants–numbering in the millions–within our borders" and "presenting most difficult problems for a Nation that prides itself on adherence to principles of equality under law." *Plyler*, 457 U.S. at 218. These problems are of a local nature as well as national. Those residing in the United States who conceal their illegal or undocumented status may be victims of crime, including assault, theft, extortion, peonage, and human trafficking, and refuse to report such crimes to authorities for fear of disclosing their status. They may be witnesses to crime, and refuse to come forward for the same reason. If they perpetrate a crime, they may be more difficult to apprehend than those whose identity is a matter of public record. They may cause their children to circumvent requirements for immunization or education, and they may skirt compliance with licensing and regulatory requirements, to avoid detection. They have a powerful incentive to commit certain offenses, such as tax evasion, the use or manufacture of false documentation, driving without a license, and the creation of black-market barter systems. Shining a light on this shadow population–recognizing it and identifying it–promotes legitimate, non-discriminatory policy objectives. Local government authorities and law enforcement officers who are expected to serve and protect *all* persons within the local jurisdiction can better do so when the shadow of secrecy is lifted.

The burden then shifts back to the Plaintiffs to show a viable alternative means is available to achieve the legitimate policy objectives *without discriminatory effects*. *Gallagher*, 619 F.3d at 833-35. The Plaintiffs have not shown a viable alternative means for the Defendants to *identify* who is residing within the City's boundaries and their

immigration status.[11]  It is apparent, however, that once the City's legitimate interest in knowing the immigration status of its residents is satisfied, the revocation of occupancy permits does nothing to further that legitimate interest.  Accordingly, the "viable alternative means" available to the City to achieve its legitimate policy objectives without discriminatory effects is to stop short of revoking occupancy permits *if* the immigration status of a resident is verified, whether that status is lawful or unlawful.

Accordingly, the Court finds that the enforcement of Section 1, Part 2, Part 3.L., and Part 4.D., of the Ordinance, prohibiting the harboring of illegal aliens, providing for the revocation of occupancy licenses, and providing for certain penalties following the revocation of occupancy licenses, violates the Fair Housing Act.

### *E.  Municipal Authority under Nebraska Law*

On September 9, 2010, after conferring with counsel for the parties regarding the appropriate wording of the question, the Court certified to the Nebraska Supreme Court the following question, accompanied by a copy of the Ordinance:

> May a Nebraska city of the first class, that is not a "home rule" city under Article XI of the Nebraska Constitution and has not passed a home rule charter, promulgate an ordinance placing conditions on persons' eligibility to occupy dwellings, landlords' ability to rent dwellings, or business owners' authority to hire and employ workers, consistent with Chapters 16, 18, and 19 of the Revised Statutes of Nebraska?

On November 5, 2010, the Nebraska Supreme Court declined the question, noting that (1) it did not appear that any construction of state law was necessary in order for this

---

[11]  The Plaintiffs have suggested a viable alternative to the revocation of occupancy permits, *i.e.*, the enforcement of federal immigration laws.  The enforcement of federal immigration laws would have the same "discriminatory effects," however, in that Latino residents would be disproportionately affected by the enforcement.

Court to resolve questions of federal law, and (2) if the Nebraska Supreme Court were to hold that the ordinance does *not* violate state law or the state constitution, that finding would not resolve the federal questions. *Keller v. City of Fremont*, 790 N.W.2d 711, 713 (2010). The Nebraska Supreme Court added:

> We have stated that """[i]n the exercise of police power delegated by the state legislature to a city, the municipal legislature, within constitutional limits, is the sole judge as to what laws should be enacted for the welfare of the people, and as to when and how such police power should be exercised." . . . '" But because the request does not identify any state constitutional provision implicated by the controversy that is unique to Nebraska, we assume the plaintiffs' state constitutional challenge coincides with federal constitutional provisions.

*Id.* at 713 (quoting *Wolf v. City of Omaha*, 129 N.W.2d 501, 508 (Neb. 1964)).

Because Article XI of the Nebraska Constitution, governing Nebraska municipal corporations, *is* unique to Nebraska, this Court understands the Nebraska Supreme Court's decision to indicate that Article XI is not "implicated" by the provisions of the Ordinance – that is, the absence of a home rule charter does not affect a municipality's exercise of its police powers generally delegated to municipalities by Nebraska statute.[12]

---

[12]Such statutory police powers delegated to cities of the first class are very broad and do not appear to be predicated on the adoption of a charter under Article XI of the Nebraska Constitution. For example, Neb. Rev. Stat. § 16-201 (Reissue 2007) provides, in part: "Each city of the first class . . . shall have power . . . to exercise such other and further powers as may be conferred by law."

Neb. Rev. Stat. §16-246 (Reissue 2007) provides:

> A city of the first class may make all such ordinances, bylaws rules, regulations, and resolutions not inconsistent with the general laws of the state as may be necessary or expedient, in addition to the special powers otherwise granted by law, for maintaining the peace, good government, and welfare of the city and its trade, commerce, and manufactures, for preserving order and securing persons or property from violence, danger, and destruction, for protecting public and private property, and for promoting the

31

Accordingly, the Plaintiffs' claim that the Ordinance is void as a matter of state law will be denied.

### F. 42 U.S.C. § 1981

The *Keller* Plaintiffs allege that the Ordinance targets Latino occupants of apartment complexes disproportionately, thereby denying them the right to make and enforce contracts on the same basis as white persons, in violation of 42 U.S.C. § 1981. (Complaint, Filing No. 1, Case No. 8:10cv270, p.17.)

The statute provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts,

---

public health, safety, convenience, comfort, and morals and the general interests and welfare of the inhabitants of the city. It may impose fines, forfeitures, penalties, and imprisonment at hard labor for the violation of any ordinance; provide for the recovery, collection, and enforcement of such fines, forfeitures, or penalties; and, in default of payment, provide for confinement in the city or county prison, workhouse, or other place of confinement with or without hard labor as may be provided by ordinance. The jurisdiction of the city to enforce such ordinances, bylaws, rules, regulations, and resolutions shall extend over the city and over all places within two miles of the corporate limits of the city.

Neb. Rev. Stat. § 16-229 (Reissue 2007) states, in part: "A city of the first class by ordinance may provide for the punishment of . . . suspicious persons who can give no reasonable account of themselves." (This Court expresses no opinion as to the constitutionality of the state statutes quoted, but refers to them only as examples of powers conferred by the Nebraska legislature to Nebraska cities of the first class, to illustrate why the Plaintiffs' state-law challenge to the Ordinance is not likely to succeed on the merits.)

and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

Applying the same logic as the Supreme Court used in *Plyler*, discussed above, an undocumented alien is a "person" for purposes of § 1981.

Section 1, part 2, paragraph A. 2. of the Ordinance provides:

Condition of lease.  An occupant may not enter into a contract for the rental or lease of a dwelling unit in the City unless the occupant is either a U.S. citizen or national, or an alien lawfully present in the United States according to the terms of United States Code Title 8, Section 1101 et seq.  An occupant who is neither a U.S. citizen or national, nor an alien lawfully present in the United States, who enters into such a contract shall be deemed to have breached a condition of the lease.  An occupant who is an alien who subsequent to the beginning of his lease becomes unlawfully present in the United States shall be deemed to have breached a condition of the lease.

The United States District Court for the Middle District of Pennsylvania addressed this issue in *Lozano v. City of Hazelton*, 496 F. Supp.2d 477, 546-48 (M.D. Pa. 2007)("*Lozano I*"), *vacated in part*, 620 F.3d 170 (3d Cir. 2010), *vacated and remanded*, 131 S. Ct. 2958 (2011).  In *Lozano I*, the District Court noted that "[w]hen Congress passes two laws which conflict, the more recent law can be viewed as an implied repeal of the earlier act in order to bring it in line with the newer law."  *Lozano I* at 547 (citing *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 503 (1936)).  Accordingly, the court found that the enactment of IRCA could be viewed as an implied repeal of § 1981 to the extent that it conflicted with IRCA.  *Id.*  A conflict arises when § 1981 provides undocumented aliens with the same right to contract as "white citizens" while IRCA prohibits unauthorized aliens from entering into employment contracts.  *Id.*  The court found that "IRCA works as

33

a repeal of section 1981 to the extent that section 1981 would allow unauthorized workers to enter into employment contracts." *Id.* The court added, "otherwise, the unauthorized workers have the same right to contract as other citizens." *Id.*

The District Court in *Lozano I* did not address the question of whether IRCA's prohibition on the harboring of aliens unlawfully in the United States (8 U.S.C. § 1324(a)(1)(A)(iii)) also worked as a repeal of § 1981 to the extent that § 1981 would allow illegal aliens to enter into leases for residential dwelling units. In *Lozano II*, the U.S. Court of Appeals for the Third Circuit, discussing federal preemption, suggested that it would *not*. The Third Circuit noted that the federal statute does not define "harboring," and that the Supreme Court has yet to define the term, but added: "[W]e are not aware of any case in which someone has been convicted of 'harboring' merely because s/he rented an apartment to someone s/he knew (or had reason to know) was not legally in the United States." *Lozano II*, 620 F.3d at 223.

The U.S. Court of Appeals for the Eighth Circuit has held that a showing of concealment is unnecessary to establish a violation of IRCA's harboring prohibition, and conduct which merely "substantially facilitates an alien's remaining in the country illegally" is sufficient to constitute harboring. *United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008). Under the Eighth Circuit's construction of the harboring provision of IRCA, that provision works a repeal of § 1981, to the extent that § 1981 would allow illegal aliens to enter into lease agreements for residential dwelling units.

The *Keller* Plaintiffs' suggestion that the Ordinance has a disparate impact on Latino occupants of apartment places fails to state a claim under § 1981. (See *General Bldg.*

34

*Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 389 (1982) (§ 1981 reaches only "purposeful discrimination"); *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 111 (1st Cir. 1988) ("A plaintiff may not make a disparate impact claim under section 1981"); *Sanders v. Culinary Workers Union Local No. 226*, 804 F. Supp. 86, 96 (D. Nev. 1992), aff'd 5 F.3d 539 (9th Cir. 1993) ("A showing of disparate impact is insufficient to sustain a cause of action under § 1981"); *Ferrill v. Parker Group, Inc.,* 168 F.3d 468, 472 (11th Cir. 1999) ("A showing of disparate impact is insufficient to sustain a cause of action under § 1981"); *O'Neill v. Gourmet Systems of Minnesota, Inc.*, 219 F.R.D. 445, 449 (W.D. Wis. 2002)("[A] claim under 42 U.S.C. § 1981 requires proof of discriminatory intent and cannot be sustained by a showing of disparate impact")).

Accordingly, the *Keller* Plaintiffs' claim under 42 U.S.C. § 1981 will be denied as a matter of law.

### G.  Commerce Clause

The *Keller* Plaintiffs allege that the Ordinance violates the Commerce Clause of the United States Constitution by requiring out-of-state business entities to register with E-Verify and use E-Verify as a condition precedent to doing business in the City.  The factual allegations in the *Keller* Complaint, however, do not indicate that any *Keller* Plaintiff has standing to raise the Commerce Clause claim.  ("The doctrine of standing . . . requires federal courts to satisfy themselves that 'the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction.'" *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009), (quoting  *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)).  "To seek injunctive relief, a plaintiff must show that he is under

35

threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury."  *Id. (*citing *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180-181 (2000)).

Accordingly, the *Keller* Plaintiffs' Commerce Clause claim will be denied as a matter of law.

## VI.  CONCLUSION

Summary Judgment will be entered for the Plaintiffs on their challenges to Section 1, Part 2, of the Ordinance, prohibiting the harboring of illegal aliens, and Section 1, Parts 3.L. and 4.D., providing for the revocation of occupancy permits and penalties for the rental or leasing of premises following such revocations, because those provisions are conflict-preempted by the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.,* in general, and § 1324, specifically, with respect to "harboring," and violate the Fair Housing Act.

Accordingly,

IT IS ORDERED that:

1.     The Plaintiffs' Motions for Summary Judgment (Filing No. 151 in Case No. 4:10cv3140, and Filing No. 161 in Case No. 8:10cv270) are granted in part, as follows:

a.   Section 1, Part 2, Part 3.L., and Part 4.D., of the Ordinance, prohibiting the harboring of illegal aliens, providing for the revocation of occupancy licenses, and providing for certain penalties following the

36

revocation of occupancy licenses, is declared void  because those provisions are conflict-preempted by the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.,* in general, and § 1324, specifically, with respect to "harboring," and violate the Fair Housing Act, 42 U.S.C. § 3604;

b.  All Defendants are permanently enjoined from taking any action to enforce Section 1, Part 2, Part 3.L., and Part 4.D., of the Ordinance;

The Motions are otherwise denied;

2.       The Defendants' Motions for Summary Judgment (Filing No. 157 in Case No. 4:10cv3140, and Filing No. 130 in Case No. 8:10cv270) are granted, except as provided in paragraph 1, above;

3.       All other pending motions are denied as moot; and

4.       A separate Judgment will be entered.

DATED this 20th day of February, 2012.

BY THE COURT:


s/Laurie Smith Camp
Chief United States District Judge